UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| AARON SCHULER and PAMELA SCHULER, husband and wife,<br><br>                    Plaintiffs,<br><br>v.<br><br>BATTELLE ENERGY ALLIANCE, LLC,<br><br>                    Defendant. | Case No. 4:18-CV-00234-CWD<br><br>**MEMORANDUM DECISION AND ORDER (DKT 15; DKT 22)** |

## INTRODUCTION

Pending before the Court is Battelle Energy Alliance, LLC's Motion for Summary Judgment. (Dkt. 15.) Also pending before the Court is Aaron and Pamela Schuler's Motion for Leave to File Amended Complaint. (Dkt. 22.) The motions are fully briefed, and oral argument was held on the motions on May 30, 2019. For the following reasons, the Court will deny the Motion for Summary Judgment and will grant the Motion for Leave to Amend.

# FACTUAL BACKGROUND

On June 14, 2017, Aaron Schuler arrived at the Idaho National Laboratory (INL) site in Idaho Falls, Idaho, to make a delivery via a long-haul semi-truck. (Dkt. 1 at 2.) Schuler was making the delivery to INL's Advanced Test Reactor Complex (ATR Complex). *Id.* The ATR Complex is a nuclear reactor designed to test nuclear fuels for the United States Navy. *Id.* Schuler sustained serious injuries while making the delivery.

## 1.      Entities involved in the facts of this case

The contractual relationship between the entities responsible for managing and operating the ATR Complex is relevant to the legal issues before the Court. The United States Department of Energy (DOE) owns the INL. (Dkt. 33 at 12.) The INL, located near Scolville, Idaho, is comprised of several facilities, including the ATR Complex. *Id.* There are two DOE administrative offices with responsibilities related to the ATR Complex, the Office of the Deputy Administrator for Naval Reactors (Naval Reactors), and the Office of the Assistant Secretary for Nuclear Energy (Nuclear Energy). *Id.*

Defendant Battelle Energy Alliance, LLC (BEA), is a Delaware limited liability company with its principal place of business in Idaho Falls. *Id.* BEA is a private contractor for the DOE. *Id.* BEA contracted with the DOE's Nuclear Energy office to carry out the Nuclear Energy office's day-to-day operation and maintenance responsibilities with respect to the ATR Complex. *Id.* at 13; Dkt. 34 at 4; 8.

Another entity, Bechtel Marine Propulsion Corporation (Bechtel), contracted with the Naval Reactors office to carry out other responsibilities related to the ATR Complex.[1] (Dkt. 33 at 13.) Under its contract with the Naval Reactors office, Bechtel designed experiments and purchased certain supplies for the experiments, including "in-pile tubes" (IPTs), which are used in a pressurized water experiment to test nuclear fuel and materials under various conditions. *Id.* at 12-13; Dkt. 34 at 4-5. Schuler was delivering one of these IPTs on the day of the incident. Pursuant to a purchase order with GE Hitachi Nuclear Energy (GE Hitachi), Bechtel purchased ten (10) IPTs. (Dkt. 33 at 14.) Under the purchase order, Hitachi, the seller, agreed to supply the IPTs to Bechtel, the buyer, and deliver them to the ATR Complex in exchange for a payment of approximately $4,500,000. *Id.* The IPT Schuler was delivering, number 28 (IPT 28), was valued at $450,000. *Id.*

Hitachi contracted with a third party manufacturer, Vigor Works, LLC, to make the large pipes, including IPT 28. *Id.* When the manufacture of IPT 28 was complete, Hitachi contracted with Combined Transport Logistics Group, Inc. (CTL), to transport the IPT from the manufacturing plant to the ATR Complex. *Id.* In turn, CTL contracted with Cardmoore Trucking Limited Partnership (Cardmoore) to provide a driver for the semi-trailer truck used to pick up and deliver IPT 28 to the ATR Complex. *Id.* Cardmoore assigned its employee, Schuler, to be the driver of the semi-trailer truck. *Id.* Cardmoore

---

[1] The parties dispute whether Bechtel's contract with the DOE included management and operation of an Idaho facility. (*See* Statement of Material Facts in Support of Plaintiffs' Response to Defendant's Motion for Summary Judgment, Dkt. 43 at 7; *see* Statement of Uncontested Facts in Support of Motion for Summary Judgment (Defendant), Dkt. 19 at 2-3.)

instructed Schuler to deliver IPT 28 to the ATR Complex. Hitachi paid CTL $4,300 to deliver IPT 28 to the site. *Id.*

The contractual relationship between the entities is illustrated in the following chart:



(Dkt. 33 at 15.)

## 2.    Facts related to the delivery of IPT 28

The ATR Complex is a high security site. (Dkt. 1 at 2.) The ATR itself is a nuclear reactor. (Dkt. 34 at 2.) The only entrance to the site is through a vehicle inspection bay. All vehicles are subject to an onsite inspection in the bay prior to entering the ATR

Complex. (Dkt. 1. At 2.) The security guards who perform onsite inspections of vehicles entering the complex are employed by BEA. *Id.*; Dkt. 33 at 15. When Schuler arrived at the inspection bay, the BEA security guards instructed him to pull his semi-truck completely into the inspection bay. (Dkt. 1 at 2.) However, the truck Schuler was driving had a 53-foot flatbed and was too long to fit entirely within the bay. *Id.* BEA guards instructed Schuler to drive the truck forward into the bay as far as possible to fit the majority of the truck into the bay for inspection. *Id.*

The entrance to the inspection bay is protected by an in-ground retractable vehicle security barrier that can be raised by the security guards to prevent vehicles from entering the bay. *Id.* Once Schuler moved the truck into the bay, the security guards ordered Schuler to exit the truck and to open the engine hood, all doors, all tool bins, and all other enclosures on the truck. Schuler complied and was then told to stand near the rear of his trailer while the guards performed an inspection of the truck, including its enclosures. *Id.* Once the inspection was complete, the guards instructed Schuler to close the previously opened areas, including the engine hood. *Id.* at 4.

To close the engine hood, Schuler had to stand directly in the front and in the center of the open hood. *Id.* Because the semi-truck was pulled as far as possible into the inspection bay, closing the hood required Schuler to stand between the vehicle security barrier and the front of the semi-truck. *Id.* The space between the security barrier and the semi-truck was approximately 18 inches wide. (Dkt. 37-7 at 10.) While Schuler was working on closing the engine hood, one of the BEA guards lowered the security barrier behind Schuler. *Id.* at 11. As the security barrier lowered, it crushed Schuler's leg. (Dkt. 1

at 4; Dkt. 37-7 at 11-12.) Schuler cried out, and once the BEA security guard realized what had happened, he raised the barrier and called for medical care. *Id.*

### 3. BEA's investigation of the delivery incident

On July 17, 2017, BEA issued a Root Cause Analysis Report regarding the delivery incident. (Dkt. 34 at 6; Dkt. 37-7 at 7.) In the report, BEA concluded that the incident was caused by (1) the negligent actions of the BEA security guard; (2) BEA's negligent training and supervision of the security guard; and (3) BEA's negligent failure to maintain and repair the wedge barrier. (Dkt. 34 at 6-7; *see* Dec. Scott J. Smith, Exhibit G, Root Cause Analysis Report, Dkt. 37-7 at 1-39.)

## PROCEDURAL BACKGROUND

As a result of this incident, Schuler filed a complaint against BEA alleging three claims: (1) BEA security guards' negligence resulted in Schuler's severe and permanent physical injuries, mental anguish, loss of enjoyment of life, past and future pain and suffering, past and future medical expenses, lost wages, and reduced wage-earning capacity. (Dkt. 1 at 5); (2) BEA had a duty to entrust the retraction of the wedge barrier to a properly trained, experienced employee capable of lowering the wedge in a manner that would not injure other persons, and BEA breached the duty (*Id.* at 5-6); (3) BEA breached its duty to properly supervise its employees through negligent supervision; and (4) due to the personal injury of Aaron Schuler, his wife, Pamela, suffered a loss of consortium. (*Id.* at 6.)

BEA filed an answer denying each of the Schulers' claims. (Dkt. 5.) BEA's answer also set forth six affirmative defenses, including: contributory and comparative negligence on the part of Aaron Schuler; res judicata and collateral estoppel; Idaho's statutory employer doctrine; Plaintiff's failure to name necessary and indispensable parties, including his employer; lack of subject matter and personal jurisdiction over the claims; and waiver, estoppel, and laches. (Dkt. 5 at 5-7.) BEA then filed the present motion for summary judgment. (Dkt. 15.) In its motion, BEA argues, because Aaron Schuler received worker's compensation benefits, and because BEA is a statutory employer of Aaron Schuler, BEA bears no third-party liability as the worker's compensation benefits were Aaron Schuler's sole and exclusive remedy for the injuries he sustained in the incident. (Dkt. 16 at 1.)

After BEA filed its motion for summary judgment, the Schulers filed a motion for leave to file an amended complaint. (Dkt. 22.) Therein, the Schulers seek permission to add two new causes of action based in negligence and one new factual allegation. *Id.* at 3. The motion also seeks permission to amend the complaint to remove Pamela Schuler as a plaintiff and to remove the claim for loss of consortium, because Ms. Schuler passed away after the filing of the complaint. *Id.* In response, BEA does not contest the motion as to the removal of Pamela Schuler, but argues the remainder of the motion is futile as the new causes of action would not save the complaint against BEA's statutory employer defense. In reply, Schuler argues that the statutory employer defense does not defeat the claims in his complaint or in the proposed amended complaint.

**STANDARD OF LAW**

**1.      Motion for Summary Judgment**

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party, demonstrates "there is no genuine issue of any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007). Evidence includes "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits…." *DeVries v. DeLaval, Inc.*, 2006 WL 1582179, at *5 (D. Idaho June 1, 2006), report and recommendation adopted, 2006 WL 2325176 (D. Idaho Aug. 9, 2006).

The moving party initially bears the burden to show no material fact is in dispute and a favorable judgment is due as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets this initial burden, the non-moving party must identify facts showing a genuine issue for trial to defeat the motion for summary judgment. *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000). The Court must enter summary judgment if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**ANALYSIS**

1.      **Idaho Worker's Compensation Act**

This motion requires the Court to consider the Idaho Workers Compensation Act (Act).[2] In general, the Act provides employees a remedy for injuries sustained in the course of employment. I.C. § 72-201; *Robison v. Bateman-Hall, Inc.*, 76 P.3d 951, 953 (Idaho 2003). While providing relief to injured employees, the Act also limits employer liability. I.C. § 72-209(1); I.C. § 72-211. The Act's remedy for injured employees is referred to as the "exclusive remedy rule." *Robison* at 953. Under the rule, worker's compensation payments are provided "to the exclusion of every other remedy, proceeding, or compensation, except as is otherwise provided in the worker's compensation scheme." *Kolar v. Cassia County Idaho*, 127 P.3d 962, 967-68 (Idaho 2005).

However, Idaho Code Section 72-223 provides that an individual who receives workers compensation benefits under the Act is not precluded from brining an action in tort for damages against a third party that is not the individual's employer. *Id.* Section 72-223(1) reads:

> The right to compensation under this law shall not be affected by the fact that the injury, occupational disease or death is caused under circumstances creating in some person ***other than the employer*** a legal liability to pay damages therefor, such person so liable being referred to as the third party.

---

[2] BEA argues that Idaho state law applies in this case. (See Dkt. 16 at 3-5.) Schuler does not challenge BEA's choice of law argument at this time. (Dkt. 33 at 3.) Therefore, for purposes of analyzing the motion for summary judgment, the Court will apply Idaho state law as it is applicable to the claims and defenses in this matter.

I.C. § 72-223(1) (emphasis added).

The Act defines an "employer" as:

> Any person who has expressly or impliedly hired or contracted the services of another. It includes contractors and subcontractors. It includes the owner or lessee of premises, or other person who is virtually the proprietor or operator of the business there carried on, but who, by reason of there being an independent contractor or for any other reason, is not the direct employer of the workers there employed.

I.C. § 72-102(12)(a); *Robison*, 76 P.3d at 955.

The Idaho Supreme Court has "developed significant case law to help give the term [employer] meaning" in the context of negligence claims against third parties. *Robison* at 954. The resultant expanded definition is termed "statutory employer" and is "designed to prevent an employer from avoiding liability" under the worker's compensation statute "by subcontracting the work to others who may be irresponsible and not insure their employees." *Id.* (internal citations omitted) (citing *Harpole v. State*, 958 P.2d 594, 597 (Idaho 1998).

To this end, the Supreme Court of Idaho has determined that the parties who are "employers" for purposes of worker's compensation benefits under Idaho Code Section 72-102 are "the same parties deemed immune from third-party tort liability" under Idaho Code Section 72-223. *Robison* at 955. In *Robison*, the court noted that, had the legislature intended any broader immunity for third parties, it could have used language distinct from that supplied in Section 72-102. *Id.* Therefore, under the Act, "an employee may have more than one employer: the employer who directly hired the employee and a

person or entity who, by statute, is also held to be the employer for the purposes of worker's compensation." *Blake v. Starr*, 203 P.3d 1246, 1248 (Idaho 2009).

This legal framework defines statutory employees in two specific categories: (1) a **category one** statutory employer "means any person who has expressly or impliedly hired or contracted the services of another. It includes contractors and subcontractors;" and (2) a **category two** statutory employer, who is "the owner or lessee of premises, or other person who is virtually the proprietor or operator of the business there carried on, but who, by reason of there being an independent contractor or for any other reason, is not the direct employer of the workmen there employed." *Id.*; *Kolar v. Cassia Cty. Idaho*, 127 P.3d 962, 968 (Idaho 2005).

In this case, BEA argues it is both a category one and category two statutory employer of Schuler, and is thus immune from third party liability. In response, Schuler argues BEA is not a statutory employer under either category. Alternatively, Schuler asserts that, even if BEA is a statutory employer, because one of the underlying contracts was for goods and not services, the Act's statutory employer defense does not apply.

In reply, BEA concedes that, if the contract *was* a contract for goods, the statutory employer defense would not apply. However, BEA asserts that, although the contract involved the purchase of a good –the IPT's from GE Hitachi– the IPT purchase was part and parcel of a larger services contract. Therefore, as a threshold inquiry, the Court will determine if the contract at issue was a contract for the sale of goods.

**2.      The contract between Bechtel and GE Hitachi was a contract for services.**

The issue of whether a contract is for goods or services is a question of law. *See Fox v. Mountain W. Elec., Inc.*, 52 P.3d 848, 855 (Idaho 2002). Under Idaho law, when contracts provide both goods and services, courts consider "whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom)." *Id.* This "predominant factor" test requires courts to consider contracts in their entirety. *Id.*

When a party is more concerned with the goods and less concerned with service-based aspects of the contract, such as who will install the goods, the predominant factor of the contract is the goods. *Pittsley v. Houser,* 875 P.2d 232, 234 (Idaho Ct. App. 1994). On the other hand, where the goods provided are "merely incidental" to services such as design, testing, and installation, the predominant factor of the contract is the services. *Fox* at 855.

Here, Schuler asserts that, because BEA is relying on a chain of contracts and subcontracts, BEA has the burden to prove that every contract in the chain was a contract for services. (Dkt. 33 at 6.) Schuler argues that BEA cannot prove that the contract between Bechtel and GE Hitachi was a contract for services. Schuler asserts that the IPTs were clearly goods, and any services provided under the contract for the IPTs, such as delivery and inspection, were incidental to the goods provided to Bechtel. (Dkt. 50 at 5.) In response, BEA asserts that the services related to the manufacture of the IPTs, such as GE Hitachi's inspections and certifications, were the predominant factors of the contract.

A close review of the entirety of the contract between Bechtel and GE Hitachi shows that the thrust of the agreement was the provision of services. Notably, the agreement contains two parts, the first is Purchase Order No. 3015656, the second is the "Atomic Power Laboratory Requirements Document." (Dkt. 41-2.)

A review of Purchase Order No. 3015656 provides the following information: (1) GE Hitachi is identified as the supplier and Bechtel is identified as the buyer; (2) shipping terms are identified, including that the method of shipping was "Seller's Choice;" (3) GE Hitachi was to supply a lot of ten IPTs, including IPT 28, to Bechtel for the fixed price of $4,571,933; (4) each IPT had a different delivery date; and (5) GE Hitachi was required to include a complete packing list with each IPT shipment. (Dkt. 41-2 at 2.)

The "Atomic Power Laboratory Requirements Document" was expressly included as "part of purchase order 3015656." [3] *Id.* at 3. The parties do not dispute that the Requirements Document is part of the purchase order. The Requirements Document first includes a list of documents that the parties agreed are also included in the purchase order. *Id.* According to the contract, Bechtel made the majority of these documents available to GE Hitachi via citation within the Requirements Document to Bechtel-run website. *Id.* at 4. These documents included items such as specification drawings prepared by Bechtel and/or the DOE, the DOE's general provisions for "Fixed Price

---

[3] Bechtel Marine Propulsion Corporation assumed responsibility for the management and operation of the Bettis Atomic Power Laboratory for the DOE on February 1, 2009. (Dkt. 41-2 at 3.) All references to Bettis in the requirements document mean Bechtel. *Id.* For purposes of this analysis, the Court will use Bechtel.

Orders," a "Seller Property Certification Data" form, and a form providing "Instructions for Seller's Preparation of Submittals," including a "Request for Engineering Change" form. *Id.* The documents included also a "Laboratory Procurement Quality Assurance Requirements" form. *Id.*

The Requirements Document further included a statement of work, pricing terms, general contracting terms, authorization and approvals terms, invoicing and payment terms, delivery terms, transportation requirements, certifications requirements, agreements related to government furnished property (GFP), inspection and quality assurance requirements, correspondence requirements, identification of key personnel, and cancellation terms. *Id.* at 5-15. It is these terms and requirements that BEA asserts show that, although the purchase order was for ten IPTs, the thrust and predominant factor of the agreement as a whole were the services GE Hitachi provided to Bechtel, and up the contracting chain, to the DOE.

BEA asserts that, "GE Hitachi is not a retail parts outlet, it is a world-leading provider of advanced reactor technology and nuclear services" and that Bechtel contracted with GE Hitachi for those services. (Dkt. 50 at 5.) BEA advances that the title of the contract –purchase order– does not trump the fact that the agreement "clearly contemplates the acquisition of services through the use of 'purchase orders'" like Purchase Order No. 3015656. *Id.* at 6.

BEA cites a case from the Northern District of Indiana, *Bamcor LLC v. Jupiter Aluminum Corp.*, as support for its argument. 767 F.Supp.2d 959 (N.D. Ind. 2011). That case centered on a contract dispute where a company agreed to refurnish and rebuild an

industrial machine's gearbox. *Id.* There, the court found that, although the contract, also a purchase order, referred to the parties as a buyer and a seller, the contract stated that its purpose was for "rebuilding certain equipment." *Id.* at 972. The price specifically included labor, equipment, and materials that the company agreed to provide. *Id.* The court noted that "activities such as mounting, setting, removing, reassembling, reworking, cleaning, replacing, and fitting the equipment" indicated the company was providing a service, and any parts the company had to purchase to complete the service-based tasks were incidental to rebuilding the gearbox.

BEA asserts that the purchase order in this case is similarly a contract for services. BEA points to the Statement of Work, which provides terms similar to those found in the *Bamcor* purchase order: "Seller [GE Hitachi] shall furnish the necessary labor, supervisions, services, tools, equipment, and materials (except as otherwise specified) and do all things necessary to accomplish the entire workscope … which is called for by the purchase order and order specifications." (Dkt. 41-2 at 4.)

The entire workscope is set forth in the Requirements Document within a table. *Id.* at 13-14. The table contains four columns: Purchase Order Period; Date by Which Obligation is Due; Total Amount of Obligation; and General Work to be Performed. *Id.* at 13. According to the table, a percentage of the total purchase order amount was to be paid to GE Hitachi at the close of nine distinct purchase order periods. *Id.* at 13-14. In turn, GE Hitachi was to perform the work on each of the IPTs in stages, culminating with the final shipment of all IPTs by the ninth purchase order period. *Id.* The nature of the work in each purchase order period included: receiving and inspecting the government

furnished metal and beginning fabrication; completion of "deep hole drilling" of the metal; completion of IFP welding and assembly, completion of IPT testing, partial shipment of items, and final shipment of items. *Id.* at 14.

The following language, which appears in the Requirements Document after the purchase order periods table, provides support for BEA's argument that the thrust of the agreement between Bechtel and GE Hitachi was the provision of services. The agreement provides: "Seller is not obligated *to provide services* for any purchase order period after the first unless and until written notification is received from [Bechtel] of an increase in availability of funds." Dkt. 41-2 at 15 (emphasis added).

The Requirements Document provides also that the purchase order "is placed pursuant to [Bechtel's] Prime Contract with the Department of Energy." *Id.* In line with that contractual structure, the purchase order provides that Bechtel would review and approve any "approval request" or request for an "engineering change" submitted by GE Hitachi, but that, GE Hitachi was still obligated to maintain the schedule to meet the completion date and delivery dates for the IPTs. *Id.* at 5.

As noted above, the Requirements Document contains invoice and payment terms as well. *Id.* at 6. These terms include that GE Hitachi was to submit a separate invoice for each purchase order showing the shipment destination. *Id.* The terms include also that Bechtel would issue checks to "Sellers" on Wednesdays, but only for delivered and completed items, and payments could be withheld should GE Hitachi fail to deliver any data or test reports and certifications required by the purchase order. *Id.* Further, the terms include that, if GE Hitachi delivered "less than the total purchase order quantity,"

payment could be made for acceptable product delivered based on unit pricing. *Id.* As a part of the payment schedule, the purchase order includes a progress schedule that indicates the percent total of the purchase order price as a weighted percentage of each stage of the item manufacture. *Id.* at 7. The percent totals were divided as follows: 5 percent for the receipt and inspection of the GFE; 25 percent for the completion of deep hole drilling of the GFE material; 60 percent for completion of the assembling and welding, per each line item; 5 percent for completion of testing; and 5% for final shipment of each item. *Id.*

Finally, the Requirements Document provides additional terms for delivery. *Id.* It states that the seller must complete the scope of work in its entirety by July 5, 2018, and make deliveries as specified of each of the ITPs to the ART Complex in Scoville, Idaho. It required that the Bechtel purchase order number appear on the outside of all shipping containers, and that GE Hitachi's packing slip had to identify the item number for each item delivered. *Id.* at 7-8.

At this juncture of the analysis, it is important to note that GE Hitachi was not the only entity involved in the manufacture of the IPTs described in Purchase Order No. 3015656. As set forth in the facts above, GE Hitachi hired a subcontractor, Vigor Works, LLC, to manufacture the IPTs. (Dkt. 33 at 15.) The Court has not been provided with the agreement between GE Hitachi and Vigor Works. However, because Schuler has not raised that agreement in the context of the determination of whether any of the contracts at issue were for the provision of goods, the Court will assume for purposes of BEA's motion for summary judgment that Vigor Works was providing services to GE Hitachi.

Yet, the existence of the agreement between GE Hitachi and Vigor Works for the manufacture of the IPTs does lend weight to BEA's assertion that the thrust of the agreement between Bechtel and GE Hitachi was for the provision of services. In its contract with the DOE, Bechtel agreed to design experiments to be conducted at the ATR Complex, and to procure all materials necessary to conduct the experiments. IPTs were one of the necessary materials. However, as is evidenced by Purchase Order No. 3015656 and the Requirements Document, the IPTs supplied for the experiments differed— depending on their intended use. As such, Bechtel ordered the IPTs from GE Hitachi according to the needs dictated by the experiments it designed, as well as according to the DOE's regulations and requirements for manufacture of materials to be used at nuclear facilities.

Bechtel relied on GE Hitachi's expertise as a provider of "advanced reactor technology and nuclear services" to ensure that the manufacture of the IPTS (by Vigor Works) conformed with Bechtel's specifications and DOE regulations. Thus, GE Hitachi was responsible for inspecting material provided by the government for the IPTs, and testing the IPTs and providing certifications to Bechtel and DOE. GE Hitachi was also required to obtain approval for any changes or deviations from the specifications provided by BEA and the DOE. The entire process of completing an IPT could take a year or more. (*See* Purchase Order No. 3015656, Dkt. 41-2 at 2.)

Considering the contract as a whole, although the predominant factor of Purchase Order No. 3015656 is the provision of ten IPTs, the predominant factor of the Requirements Document, which the purchase order expressly incorporates, is the

provision of GE Hitachi's services during the IPT manufacturing process. The Requirements Document colors the nature of the relationship between Bechtel and GE Hitachi. Although the IPTs themselves were important and the ultimate goal of the contract, the duties GE Hitachi had under the agreement show that its involvement was centered on the provision of advanced nuclear technology services. Therefore, the Court finds that the contract between Bechtel and GE Hitachi was a contract for services. As such, the Court will address the issue of whether BEA is a statutory employer of Aaron Schuler.

**3.      BEA is not a category one statutory employer of Schuler.**

Here, BEA argues it is a category one statutory employer of Aaron Schuler. To qualify as a category one statutory employer, BEA "must be liable to pay worker's compensation benefits if the direct employer" did not. *Fuhriman v. State, Dep't of Transp.*, 153 P.3d 480, 485 (2007). A party is liable as a statutory employer "for payment of worker's compensation to an employee of its contractor whenever a contractor is liable to its employee under the Worker's Compensation Laws." *Id.*  As a statutory of the contractor's employees, the same party is also the "employer" of the contractor's subcontractor's employees. *Id.* (citing *Venters v. Sorrento Delaware, Inc.*, 108 P.3d 392, 396 (Idaho 2005).

When there is no direct or indirect contractual or employment relationship between an entity and an injured employer, there is not a statutory employer relationship. *Struhs v. Prot. Techs., Inc.*, 1992 P.2d 164, 169 (1999). Put another way, where an employer indirectly employs a party through a succession of service contracts, it is the

statutory employer. *Id.* at 720. However, the inverse is also true: where a party has "no contractual employment relationship" with the injured party, it is not a statutory employer. *Id.* Thus, to determine whether BEA was a statutory employer of Schuler, the Court must determine whether BEA indirectly employed Schuler through the chain of service contracts that led to Schuler delivering IPT 28 to the ATR Complex.

The chain of contracts is as follows: Schuler was employed by Cardmoore; Cardmoore contracted with the transportation company CTL to provide Schuler as a driver; CTL was hired by GE Hitachi to transport the pipe; GE Hitachi was hired by Bechtel to supply the pipe (and GE Hitachi contracted with Vigor Works to manufacture the pipe); Bechtel was hired by the DOE's Naval Reactors office to design experiments and procure any necessary equipment; and the DOE funded and managed its Naval Reactors office. This is where the contract chain ended for the procurement of IPT 28 delivered by Schuler.

BEA asserts that, because there is an unbroken chain of service agreements between the DOE and Schuler, the DOE[4] qualifies as a statutory employer of Schuler under Idaho law. *Id.* at 10. BEA then argues that, because DOE is a statutory employer of Schuler, BEA "shares DOE's status as a statutory employer for purposes of the personal injury claims asserted by Plaintiff." *Id.* To support this argument, BEA points to Idaho Code Section 72-209(3).

_____

[4] Notably, Plaintiff is not suing DOE, but instead, BEA, which contracted with DOE to manage the ATR Complex.

Idaho Code Section 72-209(3) extends the worker's compensation law's exemption from liability from employers "to the employer's surety, and to all officers, agents, servants and employees of the employer or surety." I.C. § 72-209(3). BEA asserts that, because it is an agent of the DOE, and the DOE is a statutory employer of Schuler, the worker's compensation law exemption extends to BEA. BEA also cites two Idaho cases to support its assertion, *Blake v. Starr*, 203 P.3d 1246 (Idaho 2009), and *Kolar v. Cassia County Idaho*, 127 P.3d 962 (Idaho 2005).

In *Blake v. Starr*, a contractor hired a subcontractor to provide flagging services on a construction site. 203 P.3d at 1247. An employee of the subcontractor was injured on the jobsite when an employee of the contractor struck him with a frontend loader. *Id.* The subcontractor provided worker's compensation to its injured employer, and the Supreme Court of Idaho found that the contractor was a statutory employer and thus not liable as a third party. *Id.* at 1249. The court found also that the contractor's immunity extended to its employee who was operating the frontend loader pursuant to Idaho Code Section 72-209(3). *Id.* at 1249-50.

The facts in this case are readily distinguishable from the facts in *Blake.* In *Blake,* Section 72-209(3) applied to extend immunity directly from the contractor who hired the subcontractor to its employee who was involved in working on the same project the injured employee was hired to work on. Here, the contractual relationship between the DOE and BEA did not involve the entities or the work performed in the contractual relationship that resulted in the hire of Schuler to deliver IPT 28. BEA asks the Court to extend the immunity of DOE as statutory employer to a separate and distinct contractual

relationship that the DOE had with BEA to manage the ATR Complex. The Court declines to do so.

In *Kolar*, the injured worker was an employee of an engineering company that was hired as an independent contractor by a county highway district to improve a road owned by the United States Forest Service. *Kolar v. Cassia Cty. Idaho*, 127 P.3d 962, 965 (2005). The county had earlier agreed to provide the personnel, equipment, and management necessary to maintain the road. *Id.* The employee of the engineering company was injured when an employee of the county ran him over with a dump truck on the road construction site. *Id.* The injured worker plaintiff argued that the county highway district was not his statutory employer, because his own employer, the engineering firm, was hired as an independent contractor. *Id.* at 968. Specifically, the injured worker argued that, because Section 72-223 specifically names "contractors or subcontractors," the Act excludes "independent contractors" from statutory employer status. The worker asserted that, because the county highway district hired his engineering firm as an independent contractor, the highway district would not have been liable as a statutory employer had the engineering company failed to pay worker's compensation benefits. *Id.*

The Supreme Court of Idaho rejected Kolar's argument, refusing to categorize the county highway district as anything other than a statutory employer simply on the basis of the type of contractor it hired. *Id.* The Court found the injured employer was the direct employee of the engineering firm, which contracted directly with the county highway district and, therefore, the county highway district was his statutory employer. *Id.* at 969. The court explained:

> At the time of his unfortunate injury, [the worker] was doing the work [the engineering company] had contracted to do. Indeed, all of the work [the engineering company] was obligated to do under its contract with the [highway district] was work required under the main contract for the project.

*Id.*

In this case, all the work Schuler's employer was obligated to do under its contract with CTL was work required under the subcontract for the project between Bechtel and GE Hitachi. This work was far removed from the work being performed by the BEA security guard who lowered the gate at the ATR Complex and injured Schuler. Therefore, there is no parallel between *Kolar* and this matter, and the Court finds BEA's argument unpersuasive.

For the foregoing reasons, the Court finds BEA was not a category one statutory employer of Schuler.

**4.      BEA is not a category two statutory employer of Schuler.**

BEA argues it was also a category two statutory employer of Schuler. Pursuant to Idaho Code Section 72-233, a party is a category two statutory employer if the party was the owner or lessee of the premises where the incident occurred, or was "virtually the proprietor or operator" of the business carried on there.

Category two statutory employers do not include parties who are "mere owners [or lessees] of the premises." *Robison v. Bateman-Hall, Inc.*, 76 P.3d 951, 956 (2003). Owners are not statutory employers unless:

> [T]he owner is also the virtual proprietor or operator of the business there carried on. To determine who is a virtual proprietor or operator, the Court must consider whether the work being done pertains to the business, trade, or occupation of the owner or proprietor and whether such business, trade, or

occupation is being carried on by it for pecuniary gain. Generally, to find a business or person to be a statutory employer, the work being carried out by the independent contractor on the owner or proprietor's premises must have been the type that could have been carried out by employees of the owner or proprietor in the course of its usual trade or business. In short, "if a person is normally equipped with manpower and tools to do a job and nevertheless contracts it to another employer, he is the statutory employer of the second employer's employees.

*Id.* (quotations omitted.)

BEA argues that, as the contracted operator of the INL ATR Complex, BEA is clearly a category two statutory employer of Schuler. However, as set forth above, the statute indicates that, to be considered a statutory employer, the "work being carried out by the independent contractor on the owner or proprietor's premises must have been the type that could have been carried out by employees of the owner or proprietor in the course of its usual trade or business. I.C. § 72-233. To make a determination to this end, the Court considers whether BEA is "normally equipped with manpower and tools" to procure and deliver the pipes, "and nevertheless contract[ed]" it to Cardmoore. BEA argues the job performed –the delivery– is part of the larger services contract, and that the DOE was equipped with the manpower and tools to make the delivery itself. BEA asserts that this fact is not disputed.

The case with facts that provide the nearest parallel is *Venters v. Sorrento Delaware, Inc.*, 108 P.3d 392 (Idaho 2005). There, a cheese factory contracted with local farmers to dispose of factory wastewater on their properties. *Id.* at 394. The cheese factory contracted with a trucking company to transport the wastewater from the factory site to the farmers. *Id.* In addition to the contract with the trucking company, the

cheesemaker contracted with the farmers to allow for the disposal of the wastewater on their properties. *Id.* at 394-95. A truck driver, employed by the trucking company, was injured while delivering wastewater to one of the farmers. *Id.* at 395. The injury occurred on the farmer's property. *Id.* At the time of his injury, the worker was covered by worker's compensation insurance from the trucking company, his direct employer, and he received benefits thereunder. *Id.*

The estate of the truck driver sued the cheese factory and the farmer. *Id.* The farmer filed a motion for summary judgment, asserting under category two, he was a statutory employer of the truck driver. *Id.* The cheese factory also filed a motion for summary judgment, asserting it was the truck driver's statutory employer. *Id.* The court held it was clear that, because the farmer was not engaged in the business of hauling water for pecuniary gain, the farmer was not a category two statutory employer. *Id.* at 397.

Here, although the DOE, a mammoth government agency, may very well have had the manpower and type of truck deliver IPT 28 to the ATR Complex, the DOE is not in the delivery transportation business. Furthermore, BEA was even farther removed from that type of activity, as it contracted with the DOE to manage and operate the ATR Complex, and was in not involved with the design of nuclear experiments or the procurement of materials to complete them. BEA was, quite simply, not in the trucking or transportation business. This reasoning coincides with the Court's analysis above regarding BEA's contractual separation from the parties contracting under the DOE's Naval Reactors office. To extend the DOE's potential statutory employer immunity

through all branches of its operations at the ATR Complex would have ramifications not intended by the Idaho Worker's Compensation Act. For these and the foregoing reasons, the Court finds BEA was not a category two statutory employer of Schuler.

**5.    The corrections in Schuler's proposed amended complaint are not futile.**

Lastly, the Court will address Schuler's motion for leave to amend his complaint. Schuler seeks leave to amend his complaint in the following five ways: (1) to remove Pamela Schuler as a plaintiff and her loss of consortium claim as a result of her recent death; (2) to remove the allegation that Aaron Schuler was employed by Combined Transport Logistics Group, Inc., because it was discovered that he was an employee of Cardmoore Trucking Limited Partnership; (3) to add an allegation regarding the BEA security guard negligently instructing Schuler about where to park his truck; (4) to add a cause of action for negligent failure to train employees; and (5) to add a cause of action for negligent maintenance and repair or the security barrier. (Dkt. 22-1 at 3.)

Federal Rule of Civil Procedure 15(a) governs pleading amendments prior to trial. Rule 15 provides that the "court should freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15 (a). Courts in the Ninth Circuit apply this policy "with extreme liberality." *Owens v. Kaiser Found. Health Plan, Inc.,* 244 F.3d 708, 712 (9th Cir. 2001). Courts consider the following factors when deciding whether to permit leave to amend:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of

amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis,* 371 U.S. 178, 183 (1962).

Although all the *Forman* factors may be considered by the court, weighing potential prejudice to the opposing party caused by any amendment carries the greatest weight. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) "Absent prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *Id.* (emphasis in original).

In response to Schuler's motion to amend his complaint, BEA does not argue the proposed amendments would cause it prejudice. Instead, BEA asserts that the amendments would be futile because, as explained above, BEA asserts Schuler's claims are defeated by the statutory employer doctrine. Yet, as the Court has explained, Schuler's claims are not so defeated. Further, the Court finds Schuler's one new allegation and two new causes of action are sufficiently related to the existing causes of action as to not cause undue prejudice to BEA. For these reasons, the Court will grant Schuler's motion for leave to amend the complaint.

## CONCLUSION

The Court will deny BEA's motion for summary judgment because BEA was not a category one or category two statutory employer of Schuler. The Court will also grant Schuler's motion for leave to file an amended complaint because the proposed amendments are not futile and will not cause undue prejudice to BEA.

## <u>ORDER</u>

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)     Defendant's Motion for Summary Judgment (Dkt. 15) is **DENIED**.

2)     Plaintiffs' Motion for Leave to File Amended Complaint (Dkt. 22) is

       **GRANTED**. Plaintiffs shall file the proposed First Amended Complaint

       within ten (10) days of this Order.

DATED: June 12, 2019

Candy W. Dale
U.S. Magistrate Judge